**FILED**
5-14-08
MAY 14 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT
NF

# UNITED STATES DISTRICT COURT

_____ NORTHERN _____ DISTRICT OF _____ ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

SHAMONTE HALL,
KARINDER GORDON and
RODNEY RAY.

**CRIMINAL COMPLAINT**

CASE NUMBER:

# 08CR 386

**MAGISTRATE JUDGE ASHMAN**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief. On or about ___ May 13, 2008 ___ in ___ Lake ___ County, in the

___ Northern ___ District of ___ Illinois ___ defendants did,

conspire to knowingly and intentionally possess with intent to distribute a controlled substance, namely, five kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title _21_ United States Code, Section _846_ .

I further state that I am a _Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives_

and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part hereof: _X_ Yes _____ No

BRANDON L. HAWKINS, Complainant

Sworn to before me and subscribed in my presence,

May 14, 2008
Date

at ___ Chicago, Illinois
City and State

U.S. Magistrate Judge MARTIN C. ASHMAN
Name & Title of Judicial Officer

Signature of Judicial Officer

STATE OF ILLINOIS      )
                       ) ss
COUNTY OF COOK         )

## **AFFIDAVIT**

I, BRANDON L. HAWKINS, being duly sworn depose and state as follows:

1.      I am employed as a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been so employed for more than eighteen years.  My primary duties as an ATF Special Agent consist of investigating and assisting in the prosecution of criminal violations of federal laws governing the possession, use, and sale of firearms, including but not limited to violations of Title 18, United States Code, Sections 922 and 924.  I am currently assigned to the Chicago Field Division Field Office.

2.      My duties primarily include the investigation of federal firearms offenses committed by members of street gangs and other organizations whose members engage in violent criminal activity.  In addition, I investigate related federal controlled substance violations, including but not limited to violations of Title 21, United States Code, Sections 841 and 846, and the commission of violent crimes.

3.      During my employment as an ATF Special Agent, I have received specialized training and have personally participated in various types of investigative activity, including but not limited to the following:  (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants, and other individuals who have knowledge concerning violations of federal firearms laws; (c) undercover operations; (d) the execution of search warrants; (e) the

consensual monitoring and recording of conversations; (f) electronic surveillance through

the use of pen registers and trap and trace devices; and (g) the handling and maintenance of

evidence.

4.     The statements made in this Affidavit are based on:  (a) my personal

participation in this investigation; (b) information provided to me by other law enforcement

officers; (c) information provided to me and other law enforcement officers by an ATF

confidential informant ("CI"); (d) review of consensually monitored and/or recorded

conversations; (e) criminal history records maintained by various law enforcement agencies;

and (f) the training and experience of myself and other law enforcement agents and officers.

## PURPOSE OF THE AFFIDAVIT

5.     This Affidavit is made for the limited purpose of establishing probable cause

in support of a criminal complaint alleging that SHAMONTE HALL ("HALL"),

KARINDER GORDON ("GORDON") and RODNEY RAY ("RAY") conspired to possess

with the intent to distribute more than five kilograms of cocaine, in violation of Title 21,

United States Code, Section 846.  Because this Affidavit is for the limited purpose of

establishing probable cause, it does not contain every fact known to me concerning this

investigation.

## CONFIDENTIAL INFORMANT

6.     Part of the information contained in this Affidavit is based on information

provided by the CI.  The CI has been providing information to law enforcement since April

2

2008.    Based on my experience and interactions with the CI, I have found the CI to be

reliable.  Among other things, the information that the CI has provided to law enforcement

regarding his/her telephonic and in person conversations with the targets of the investigation

has been corroborated through surveillance and the electronic recordings of some of those

conversations.  In addition, the CI has made telephone calls to the targets of the investigation,

and introduced an ATF Special Agent, acting in an undercover capacity (the "UC"), to the

targets of the investigation.  Law enforcement officers believe that the information provided

by the CI has been credible because it has been corroborated by monitored and recorded

undercover meetings in which the UC has participated.

      7.    Based on information presently known to law enforcement, the CI has two

prior convictions as an adult:  aggravated unlawful use of a weapon in a vehicle; and

aggravated battery in a public place.  In or around December 2007, the CI was convicted of

aggravated unlawful use of a weapon in a vehicle, and sentenced to serve 18 months in the

Illinois Department of Corrections ("IDOC").  On or around that same date, the CI was

convicted of aggravated battery in a public place, and sentenced to 35 days in jail with credit

for time served.  In or around March 2008, the CI was released from IDOC and placed on

parole.  In or around April 2008, while on parole, the CI was arrested by the North Chicago

Police Department for possession of approximately 20 grams of marijuana.  The CI is

cooperating with law enforcement in the hope of receiving reduced sentences for violation

of the terms of his parole and possible charges arising from his arrest for possession of marijuana.

## THE INVESTIGATION

### Events Leading Up To The Arrest of HALL, GORDON And RAY
### On Tuesday, May 13, 2008

8.      On or around Friday, April 18, 2008, at approximately 11:30 am, ATF and other law enforcement agents met with the CI concerning information that the CI had relating to potential criminal activity in or around North Chicago.  During the interview, the CI stated that he knew of several individuals, including HALL and GORDON and possibly others, who were interested in doing a "lick."  The CI explained that "lick" was a street term for an armed robbery or home invasion in order to steal narcotics and money.  The CI stated that the HALL and GORDON were members of the Black Disciples street gang in North Chicago.

9.      On or around Wednesday, April 23, 2008, at approximately 2 pm, ATF and other law enforcement agents again met with the CI.  During the meeting, the CI stated that the previous Sunday, April 20, 2008, the CI had attended a cookout in or around North Chicago.  While at the cookout, the CI had spoken with GORDON.  According to the CI, GORDON had indicated to the CI that he was interested in doing a "lick."

10.     On or around Thursday, April 24, 2008, at approximately 7:15 pm, the CI made a telephone call to HALL in the presence of direction of law enforcement.  During the conversation, which was not recorded, the CI indicated to HALL that the CI knew of an

4

individual who was looking for a crew to do an armed robbery of a house containing narcotics. The CI told HALL that HALL could meet with this individual that evening at a bar called Mr. B's Lounge ("Mr. B's") in North Chicago. Unknown to Hall, the individual looking for a crew to do a "lick" was an undercover ATF agent (the "UC").

11.    On or around April 24, 2008, at approximately 7:45 pm, the CI and HALL arrived at Mr. B's. Mr. B's is located at 700 Broadway Road in North Chicago, Illinois. A short while later, the UC arrived at Mr. B's. After the CI introduced the UC to HALL, HALL and the UC had a conversation about a "lick."

12.    During the conversation, which was recorded, the UC explained to HALL that the UC was a drug courier for a narcotics distribution organization in North Chicago. The UC explained that he was unhappy with the narcotics organization because the last time that he had acted as a courier for the organization, the UC's son had become ill and had to be hospitalized. The narcotics organization had refused the UC's request for additional compensation so that he could pay for his son's care. The UC wanted to take his revenge on the narcotics organization by robbing the narcotics organization of their drugs at the stash house. The UC was looking for an outside crew to conduct the robbery.

13.    HALL told the UC that he had a crew that did armed robberies. The UC told HALL that the individuals at the stash house were armed, and kept pistols tucked in their waistbands. HALL stated that the fact that the individuals would be armed with pistols was

5

not a problem. HALL stated that he and his crew would kill everybody so that there would

not be any repercussions.

14.     The UC told HALL that he usually transported cocaine for the organization

once a month. The UC stated that he usually received two kilograms of cocaine to deliver

to the organization's customers, but that there was generally 10 to 12 kilos at the stash house

if he arrived early enough. The UC stated that he never knew the exact location of the stash

house until right before the UC's contact with the narcotics organization called the UC to

pick up the cocaine. The UC stated that he usually entered the stash house through the

garage, and waited for the individuals to give the cocaine to him to transport.

15.     The UC stated to HALL that there were usually two individuals at the drug

house. In response, HALL stated that since there would be two individuals at the stash

house, HALL would be bring three guys so that it would be a two on one situation.

16.     The UC asked HALL if he had done this type of criminal activity in the past.

HALL emphatically responded that he had. The UC told HALL that he wanted people who

knew what they were doing, and did not want any weak individuals because the individuals

at the stash house were dangerous people. HALL assured the UC that he did not deal with

any weak individuals, and only had guys on his crew who could handle themselves. At this

point, HALL and the UC ended the conversation, and went inside Mr. B's.

17.     On or around Tuesday, April 29, 2008, at approximately 2:26 pm, the CI made

a recorded call to HALL. During the conversation, HALL agreed that the CI could give

6

HALL's number to the UC so that the UC could contact HALL directly in order to set up another meeting to discuss the armed robbery of the stash house.

18.    On or around Thursday, May 1, 2008, at approximately 2 pm, the UC called HALL at the telephone number that HALL had, on April 29th, authorized the CI to provide to the UC. During the unrecorded telephone call, the UC set up a meeting with HALL for the next day, Friday, May 2, 2008, at Mr. B's.

19.    On Friday, May 2, 2008, at approximately 1 pm, the UC met with HALL in the parking lot at Mr. B's Lounge in North Chicago. The meeting was recorded. HALL arrived at Mr. B's driven in a car with two other unidentified individuals. As HALL exited the car, HALL told the UC that the driver of the vehicle was going to sell the kilos of cocaine that they were planning to obtain in the armed robbery. HALL also told the UC that the passenger in the car carried a firearm, and would participate in the armed robbery of the narcotic organization's stash house.

20.    The UC asked HALL how he planned to rob the individuals at the stash house. HALL stated that he and his crew would run into the garage at the stash house when a car entered the garage, or they would kick in the door to the garage. The UC asked HALL if his crew had any problem shooting the individuals at the stash house. In response, HALL stated that, for the right price, they would kill the people in the stash house.

21.    HALL stated that his crew would not hesitate to kill the individuals at the stash house. HALL stated that it might be possible to tie up the individuals the stash house, but

that his crew would have to surprise them in order to make sure that the individuals at the stash house did not pull out their firearms.  HALL stated that he and his crew would also tie up the UC, so that the narcotics organization would not believe that the UC was involved in the armed robbery.

22.    HALL told the UC that he had already informed the members of his crew of the details of the robbery.  HALL stated that his crew was ready to go 24 hours a day.  The UC told HALL that he typically received a call from his narcotics organization contact approximately one day before the UC was to pick up the drugs.  HALL told the UC to call HALL when the drugs were ready, and HALL and his crew would respond.

23.    HALL further stated that he had a friend who had been released from jail that morning, and had already called HALL to inquire about places to rob.  HALL advised the UC that he would bring this individual along to the armed robbery of the stash house.  HALL stated that he planned to bring a total of four individuals to rob the individuals at the stash house so that they would have a two to one advantage.  At this point, the conversation ended, and the UC left Mr. B's.

24.    On or around Saturday, May 10, 2008, at approximately 6 pm, the UC made a telephone call to HALL.  During the telephone call, which was not recorded, the UC told HALL that he expected to receive a call to pick up cocaine from the stash house on Tuesday, May 13, 2008.  The UC asked HALL whether HALL and his crew were still on to rob the individuals at the stash house.  According to the UC, HALL stated that he and his crew were

8

ready, and that the UC should call HALL to let HALL and his crew know when it was time to hit the stash house.

25.    On or around Monday, May 12, 2008, at approximately 6:25 pm, HALL made a telephone call to the UC.  In the telephone call, which was recorded, the UC told HALL that the UC expected to pick up the cocaine at the stash house the next day, May 13, 2008, at approximately 2 pm, and that the UC could pick up HALL and his crew and drive them to the stash house.

### Events of Tuesday, May 13, 2008

26.    On or around Tuesday, May 13, 2008, at approximately 11:00 am, HALL called the UC.  During the telephone call, which was recorded, the UC told HALL that he would be arriving in North Chicago  at approximately 12:30 pm.  At approximately 12:40 pm, HALL called the UC again.  During the telephone call, which was not recorded, the UC told HALL that he was approximately twenty minutes away from North Chicago.  At approximately 1:30 pm, HALL called the UC again.  During the telephone call, which was not recorded, the UC told HALL that the UC was approximately five minutes away from Mr. B's in North Chicago.

27.    The UC was driving an undercover ATF vehicle ("UCV"), and wearing electronic recording equipment that recorded both audio and video.  At approximately 1:35 pm, the UC picked up HALL, and another individual near Mr. B's in the UCV.  The other individual told the UC that his name was Rob.  HALL informed the UC that Rob was the

individual who HALL had told the UC on May 2, 2008, had just been released from jail and was looking for places to rob. Rob was later identified as RODNEY RAY. I will identify RODNEY RAY hereinafter as "RAY."

28.    HALL instructed the UC to drive to Waukegan where they would pick up another member of his crew who had the guns needed for the armed robbery. As the UC drove HALL and RAY to Waukegan, the UC told RAY that he was a disgruntled drug courier for a narcotics organization. The UC told RAY, just as he had previously told HALL on May 2, 2008, that he was unhappy with the narcotics organization because the last time that he had acted as a courier for a load of cocaine, his son had become ill and had to be hospitalized. The narcotics organization, however, refused the UC's request for additional compensation so that he could pay for his son's care. As revenge, the UC wanted to rob the narcotics organization of its cocaine at the stash house.

29.    The UC also told RAY that he transported approximately two kilos of cocaine for the organization per month, but there was generally 10 to 12 kilos at the stash house if he arrived there early enough. The UC stated that there were usually two individuals at the drug house. The UC stated that, the day before, on Monday, May 12, 2008, the UC had spoken to his narcotics organization contact, and been informed that the stash house where the UC was to pick up the cocaine was located near Foss Park in North Chicago. The UC stated that his drug organization contact had directed him to wait at Foss Park for a telephone call from the organization with the exact location of the stash house.

30.    The UC told RAY that he expected that the individuals at the stash house would have guns.  In response, RAY stated that guns would not be a problem.  RAY stated that he would enter the house through the garage with a gun and start blasting away.  The UC asked RAY whether he had done any previous armed robberies.  RAY told the UC that "we're experts."  The UC observed that RAY was very excited at the prospect of the armed robbery.  The UC told HALL that he hoped the other person they picked up would be as excited as RAY about robbing the stash house.

31.    HALL instructed the UC to drive to an apartment located at 1417 Golf Road in Waukegan, Illinois.  HALL explained that the individual who had the guns for the armed robbery lived in an apartment at 1417 Golf Road, and that this individual would be part of the crew for the armed robbery.  When they arrived, HALL went into the apartment building.  RAY stayed in the UCV with the UC.

32.    HALL returned to the vehicle, and reported that the individual was not home.  HALL instructed the UC to drive back to North Chicago to check to see if the individual was at his mother's house.  Based on directions provided by HALL, the UC drove HALL and RAY to the neighborhood around Mr. B's.  After a few minutes, HALL located the individual to whom HALL had been referring.  This individual was later identified as KARINDER GORDON.  GORDON got into the back seat of the UCV.

33.    At the direction of HALL, the UC drove HALL, RAY and GORDON back to GORDON's apartment at 1417 Golf Road in Waukegan.  While enroute to GORDON's

11

apartment, the UC asked GORDON if the others had told GORDON that there would be 10 to 12 kilos of cocaine in the stash house. The UC told GORDON that RAY had told the UC that HALL, RAY and GORDON were experts at this kind of thing. As the UC talked to GORDON, the UC was able to observe GORDON in the rearview mirror. Although GORDON did not respond verbally to the UC, the UC observed that GORDON was listening and giving affirmative responses in the form of "uh-huhs" and nods as the UC spoke.

34.    When the group arrived at GORDON's apartment at 1417 Golf Road in Waukegan, HALL and GORDON went inside the apartment building. The UC and RAY stayed in the UCV. When HALL and GORDON emerged from the apartment building, the UC observed that GORDON had changed his clothes and was now wearing all black clothing. HALL and RAY were already dressed in all black clothing.

35.    The UC met HALL and GORDON at the back of the UCV. The UC had told HALL and GORDON that the UCV had a secret trap compartment, and that HALL and GORDON could hide the guns in the trap compartment. When HALL and GORDON reached the UCV, the UC opened the trap compartment. HALL and GORDON each pulled a revolver from their waistbands, and placed the two firearms, both .38 caliber revolvers, in the trap compartment. The UC, HALL and GORDON then got back into the UCV.

36.    The UC drove the group toward North Chicago. For the benefit of Gordon, the UC explained that they would wait at Foss Park for a call from the UC's narcotic organization contact with the location of the stash house. As they drove to Foss Park, the UC

stated that he hoped that the stash house contained 12 kilos of cocaine, so that each of them would get three kilos of cocaine.  HALL, RAY and GORDON indicated that they agreed with the UC that they hoped that the house contained at least 12 kilos of cocaine.

### Arrest Of HALL, RAY And GORDON At Foss Park

37.    On Tuesday, May 13, 2008, just before approximately 3 pm, the UC drove into Foss Park with HALL, RAY and GORDON,  and parked the UCV.  While HALL and RAY used the nearby restrooms, the UC talked with GORDON.  The UC asked GORDON whether GORDON was sure that he wanted to do the armed robbery.  As GORDON began to unfold a black ski mask that he had removed from his pocket, GORDON told the UC that not just anyone can do this kind of thing.

38.    The UC asked GORDON whether he did any work other than armed robbery. GORDON explained that he, HALL and RAY were involved in a number of other illegal activities, including distributing cocaine, crack and other illegal drugs.  By this time, HALL and RAY had returned from the restroom, and joined the conversation with the UC and GORDON.

39.    At approximately 3 pm, the UC gave a predetermined arrest signal, and HALL, RAY and GORDON were taken into custody without incident.  Law enforcement then recovered two loaded .38 caliber revolvers from the secret trap compartment in the UCV.

## <u>CONCLUSION</u>

40.      Based on the foregoing facts, I respectfully submit that there is probable cause

to believe that SHAMONTE HALL, KARINDER GORDON and RODNEY RAY conspired

to possess with the intent to distribute in excess of five kilograms of cocaine, in violation of

Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

BRANDON L. HAWKINS
Special Agent, ATF


Subscribed and sworn to before me this 14th Day of May, 2008


HONORABLE MARTIN C. ASHMAN
United States Magistrate Judge

14